WILLIAM H. SMITH *vs.* RHODE ISLAND COMPANY.

JUNE 29, 1916.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

*(1)  Release.  Fraud.*

In an action for personal injury alleged to have been caused by the negligence of defendant, the defence was interposed that in consideration of certain payments to him the plaintiff had released all causes of action for such injury, which defence was met by the claim that the release had been obtained by the fraudulent representations of the claim agent of defendant who stated to him that his doctor had told the claim agent that plaintiff would be out in two weeks and able to go to work again.

*Held,* that such a misrepresentation as a matter of law related to a material fact and was one upon which, if believed, the plaintiff had a right to rely, and rendered void any settlement based thereon.

*Held,* further, that the issue of fact as to the fraud of the claim agent was to be determined in accordance with the preponderance or weight of the evidence.  Upon such an issue it is necessary to consider carefully the evidence to see whether the facts proved are not reasonably reconcilable with fair dealing and honesty of purpose or are so clear and convincing as to lead a reasonable man to the conclusion that fraud in fact exists.  VINCENT, J., dissenting.

*(2)  New Trial.*

The opportunity to hear and see witnesses is of such value in determining the weight to be given their evidence that the findings of fact of a jury ought not to be lightly set aside when they are upheld by the decision of the trial judge.  It should not be done unless it is plain that an injustice has been done.

*(3)  Reasonable Time to Disaffirm Release.  Fraud.*

If only the question of reasonable time in repudiating a release is involved, the question may be one of law only; but if there is conflicting evidence as to

the facts it is primarily a question for the jury and if it is found as a fact that after knowledge of the alleged fraud a plaintiff accepted part of the money to be paid him under an agreement to settle, it would be weighty as evidence of a ratification of the act.

(4)  *Charge of Court. Special Findings.*

It is not error for the court to inform the jury of the effect of their answer to a special finding in relation to their general verdict.

TRESPASS ON THE CASE for negligence. Heard on exceptions of defendant and overruled. VINCENT J., dissenting.

BAKER, J. This case is before the court on defendant's bill of exceptions. It was tried in May, 1915, and there was a verdict for the plaintiff for $3,000. There had been two previous trials and in both verdicts were rendered for the plaintiff, each of which on motion was set aside by the trial judge, in the first instance without any statement of the reason therefor, in the second because it was held to be against the evidence. The verdict at the third trial was upheld by the trial judge by denying a motion for a new trial in a rescript which briefly considers the question of liability and discusses at length the question of damages.

The bill of exceptions contains fifty-seven exceptions, the first forty-eight of which are waived by the brief of the defendant corporation. The 49th exception was taken to the refusal of the court to allow and to submit to the jury a certain question presented by it for a special finding. The transcript fails to show what this question was nor does it appear among the papers of the case. It is, therefore, not before us and said 49th exception is accordingly overruled.

The 50th and 51st exceptions were taken to portions of the charge of the court to the jury, the 52d to the refusal of the court to charge as requested by the defendant, the 53d to a portion of the argument of plaintiff's counsel to the jury, and the remaining four exceptions to the decision of the Superior Court in denying the defendant's motion for a new trial, the 54th on the ground that the verdict was "contrary to the evidence and the weight thereof," the 55th

on the ground that the verdict was "contrary to the law," the 56th on the ground that the damages awarded were excessive, and the 57th on the ground that the special finding of the jury was against the evidence and the weight thereof. Some of these exceptions raise questions of law of importance not heretofore passed upon by this court.

It will be convenient to consider first the question of liability so far as that may be determined by the evidence; that is, whether the verdict was against the evidence, considering at the same time the 54th and 57th exceptions, and afterwards to take up the same question as it is affected by the law applicable to the facts.

To understand the questions of fact at issue a brief summary of the evidence is necessary. The plaintiff was a passenger, Friday, March 14, 1913, shortly after 6 o'clock P. M., on one of the electric cars of the defendant operated in Woonsocket. The car in rounding a curve in the track at a high rate of speed threw the plaintiff from his seat to a grating on the floor of the car. He struck upon his right knee, by reason of which he suffered physical injury. He was assisted to another car, by which he reached a point near his home, where upon his arrival he immediately went supperless to bed. The following day, Saturday, he went to work in the morning and remained until the shop closed at noon, when he returned home and went to bed. On Sunday morning, the 16th, Dr. William F. Barry was called in to attend him. On Monday, the 17th, at some time not very long after noon, Patrick F. Cassidy, Esquire, a member of the Rhode Island bar and a claim agent of the defendant, acting without any request of the plaintiff, called at the latter's house for the purpose of adjusting the matter, and found the plaintiff in bed. His daughter, Bertha, was in attendance upon him. After some preliminary conversation and a brief discussion, in which the three participated, it was agreed that the plaintiff was to be paid $63 in cash, and that the company would also pay Dr. Barry's bill for medical attendance upon him, and thereupon the plaintiff

signed and delivered a release under seal of "all manner of actions, causes of action, debts, dues, claims, demands and suits" which he had "against said company, either in law or in equity, growing out of or arising from an injury or injuries, loss or losses sustained by him in said accident," whereupon Mr. Cassidy paid to the plaintiff such portion of said sum of $63 as was convenient for him then to pay. Mr. Cassidy thought he was at plaintiff's house "fifteen or twenty minutes, not more than half an hour approximately, all told."

The question of defendant's original liability for plaintiff's injury resulting from the accident is not contested. But the release was relied upon as a bar to the action. As to this, the plaintiff while admitting the execution and delivery of the release, claims that it was obtained from him by fraud perpetrated by defendant's claim agent. Thus the chief issue of fact in the case is a question of fraud, with the burden resting upon the plaintiff to establish it in order to recover.

The plaintiff's own testimony on which he relies in part to establish fraud is found in the transcript when he was testifying in rebuttal. It is as follows: "Q. (By Mr. Walling): Mr. Smith, I hand you a release marked 'Defendant's Exhibit A.' and ask you when you signed that release? A. On the 17th day of March, 1913. Q. What were the circumstances prior to the signing of that release? A. Mr. Cassidy came to my house on the 17th of March, 1913, and when he came into the room, he said 'Mr. Smith, I am sorry to see you laid up—Q. Just a minute, Mr. Smith, did you send for Mr. Cassidy? A. No, sir. Q. Did anybody in your behalf send for Mr. Cassidy? A. Not that I know of. Q. Very well, now, then, what did Mr. Cassidy say when he came in? A. He said 'Mr. Smith I am sorry to see you laid up. It was an accident for which no one was responsible, and the company isn't liable, but seeing you were injured on their car, we are willing to allow you two weeks pay.' I told Mr. Cassidy, I said 'Mr. Cassidy, if the company wasn't liable, I don't want no two weeks pay.' Then he said 'If

you will sign a release I will give you four weeks pay.' Said I, 'No, sir.' Then said he 'If you will sign the release I will give you four weeks pay and your doctors' bills.' I told him no. Said I, 'I can't sign no release, not knowing how long I will be laid up, or how serious my knee is injured.' Then he said if it was anything of a serious nature, he would allow me so much money and I could pay my own doctors' bills. Then I asked him how he knew it wasn't anything of a serious nature, and he said that Dr. Barry had told him that it wasn't anything of a serious nature, and that I would be out in two weeks and able to go to work again. My daughter who was present then asked him, says she, 'Did Dr. Barry make that statement, and use them words?' and he said yes. Says she, 'When did he make that statement?' Said he 'This morning.' 'Well,' says she, 'You are sure, Mr. Cassidy, that Dr. Barry made that statement?' Said he 'yes.' Then I spoke up. Said I, 'Mr. Cassidy, I want no trouble with the railroad company, neither do I wish to create any trouble' and said I 'neither do I wish to create any trouble, and relying on your words that the company isn't liable, and Dr. Barry has told you that I would be out in two weeks and able to go to work again, I have no objections to signing that release under them conditions, but not under no other conditions would I sign it.' Q. Was anything further said by Mr. Cassidy? A. Mr. Cassidy then, when he was going out, he told me that I could hire any doctor that I see fit and send the bill to him, and he would pay the doctor. Q. Was that money paid over? A. It was paid to my daughter in my presence, part of that money and handed to me—I asked him for no money."

Miss Bertha M. Smith testified to substantially the same thing. Mr. Cassidy's testimony relative to what occurred when the release was signed was as follows: "Q. Now Mr. Cassidy, will you kindly state to the jury just what occurred when you went to Mr. Smith's house? A. Yes, sir. Q. What the conversation was between you and Mr. Smith, or the daughter; tell everything that occurred in the room with

relation to the making of this statement, Mr. Cassidy?
A. Yes, I will. On the afternoon of March 17th, 1913,
at about one o'clock I called over to the residence of Mr.
Smith, which is on Park Avenue, and I met there Mr. Smith,
who was in bed, and Bertha M. Smith, who was attending
him. I disclosed my identity to Mr. Smith, although Mr.
Smith admitted that he knew me, belonging to the same lodge
a long time. I questioned Mr. Smith relative to the accident,
and Mr. Smith told me he was coming home from his place
of employment, which was the Woonsocket Machine & Press
Company; that he took a seat somewhere in the rear of the
car; and that the car took the Mason Street and Second
Avenue curve at a high rate of speed, causing him to be
thrown to the floor of the car. After finishing that, I
offered Mr. Smith two weeks wages, and in reply to that Mr.
Smith said that he thought that the company ought to do
more than that; that he thought he would be laid up for a
period over two weeks. I replied to Mr. Smith this, that if
it was worth anything to the Rhode Island Company to
settle it, it was worth something to him. At that time his
daughter said that it wouldn't pay her; that she was taking
care of him, and that she ought to be allowed something.
Then I increased my offer to four weeks wages, allowing his
daughter $10 for her services in nursing her father, and agreed
when Dr. Barry got through treating him that he would send
his bill to the Rhode Island Company, and that we would
assume that. Bertha M. Smith, his daughter, then said to
the father 'I think that is all right, you better accept it,
father.' Mr. Smith agreed to it and his daughter agreed
to it, and I made out this release . . . and showed that
to the daughter, and the daughter took some—probably a
few minutes in reading that over, and also Mr. Smith. I
explained to Mr. Smith and Miss Smith that this forever
barred any right that they might have against the Rhode
Island Company for any damage sustained by reason of this
accident. Both Mr. Smith signed the document and Bertha
M. Smith and myself witnessed it. I didn't have sufficient

money with me, and I told Bertha Smith, if she would call at my office some time the following day, I would pay her the balance of the money; that I was leaving then immediately for Providence to witness the St. Patrick Day parade. Q. Did you leave for Providence ? A. I did, yes, sir." This witness in rebuttal testified as follows: "Q. (By Mr. Williams): Mr. Cassidy on March 17th did you tell Mr. Smith that the Rhode Island Company wasn't liable, but seeing he was hurt on one of their cars, you thought he ought to get something out of it ? A. I did not. Q. Did you tell Mr. Smith that Dr. Barry had told you that he would be well and out in two weeks ? A. I did not tell him." And in cross-examination when first on the stand he testified thus: "Q. Mr. Cassidy did Dr. Barry tell you before you went over to see Mr. Smith that Mr. Smith would be well and at work in two weeks ? A. No, sir, he did not. My trouble with the doctors is that I can't get them to state when a man will be well. I had no conversation with Dr. Barry about him being well in two weeks. Q. Dr. Barry didn't tell you that he would be well within two weeks at any time before this release was signed, is that right ? A. No, sir, he did not."

Dr. William H. Barry when asked, "Dr. Barry did you ever tell Mr. Cassidy that Mr. Smith would be out in two weeks time and back at his work?" answered, "No, sir."

(1) By these quotations from the transcript of the testimony it appears that the plaintiff's claim of fraud consists in this, namely, that Mr. Cassidy, as an inducement to the former's signing the release, said that Dr. Barry had that morning stated to him, Cassidy, that Smith would be out in two weeks and able to go to work again. The evidence that Dr. Barry had not in fact made the statement is undisputed. The disputed question of fact is, therefore, did Mr. Cassidy say to Mr. Smith before the latter signed the release that Dr. Barry had so stated ? If Mr. Cassidy did say so and his present testimony that Dr. Barry had not so stated is credited, he said what was untrue, and what he knew to be untrue.

The importance of this disputed question of fact was recognized by the submission to the jury of the following question on which it was instructed to return a special finding. This is the question: "Did Patrick F. Cassidy on March 17th, 1913, tell William H. Smith that Dr. Barry told him that he, Smith, would be out and at work in two weeks ?" To this the jury answered "Yes." The record of the case clearly shows that it is upon this finding of fact that the plaintiff primarily rests his claim of a right to recover. The trial court in denying the motion for a new trial of necessity upheld this finding of fact. Was it error ? It has been urged in behalf of the defendant that the rule relative to the character and the amount of evidence necessary to establish fraud in cases like the present is more stringent and exacting than in ordinary civil cases. The notes in annotation of *Lepley* v. *Andersen*, 33 L. R. A., N. S., 836 (142 Wis. 668), give with great care and fulness the various expressions used by courts in characterizing the evidence needful in such cases, with citation of cases in which they occur. There is a great variety of these expressions ranging from "by the preponderance of the evidence" through different shadowy gradations to the requirement that it must be proved "beyond a reasonable doubt." There is not much support of the last view, a great weight of authority in favor of the first statement, with considerable authority for some intermediate positions. "Clearly proved," "clearly established," "clear and convincing" are somewhat typical expressions. But in 10 R. C. L. p. 1016, the rule is thus stated: "On the trial of a civil action wherein the claim or defence is based on an alleged fraud, the issue may be determined in accordance with the preponderance or weight of evidence, whether the facts constituting the alleged fraud do, or do not, amount to an indictable offense." See, also, 20 Cyc. 121. In 12 R. C. L. 438, in discussing the quantum of proof necessary to establish fraud the difficulty of deducing a workable rule from court decisions is pointed out and on p. 439 it is said, "It would seem, however, that aside from the very few cases, holding that

fraud must be established beyond a reasonable doubt, there is really no conflict as to the quantum of proof required, and that the various declarations which at first glance suggest a conflict relate rather to what constitutes a preponderance in the particular cases." *Nelson* v. *Pierce*, 18 R. I. 539, was an action of trespass on the case for seduction and it was urged that the act of seduction, being a criminal act, must be proved beyond a reasonable doubt. But the court said, "The overwhelming weight of the authorities is to the effect that all issues of fact in a civil case are to be determined in accordance with the preponderance or weight of the evidence." This is the rule applicable to the determination of the issues in the present case. The use of the expressions "clear and convincing," "clear, unequivocal and convincing" and the like is probably due to the fact that fraud must ordinarily be proved by circumstantial evidence, "a concatenation of circumstances, many of which in themselves amount to very little, but in connection with others make a strong case." In such circumstances it is necessary to carefully consider the evidence to see whether the facts proved are not reasonably reconcilable with fair dealing and honesty of purpose or are so clear and convincing as to lead a reasonable man to the conclusion that fraud in fact exists.

In the present case the testimony of the plaintiff and his daughter on the disputed issue of fact was unquestionably clear. The jury must have accepted it as convincing. To determine whether they were entitled to do so requires consideration of other testimony and circumstances. In addition to the testimony already quoted, the testimony of the plaintiff and his daughter was in conflict with that of other witnesses in certain particulars, for example, as to whether or not plaintiff and his daughter inquired of Dr. Barry on March 18th if he had made the statement in question, as to when the remainder of the $63 was paid, and as to whether the plaintiff on March 18th and several times afterwards asked Dr. Barry to request Mr. Cassidy to come to the plaintiff's house. Some seemingly pertinent facts

and circumstances are the following.  Miss Smith, late in
May, at the request of her father, saw Mr. Cassidy.  She says
she then asked him to come and see her father, but he refused
to do so.  On that occasion she also asked Mr. Cassidy if
he would pay Dr. Kellogg, if the latter was employed in
place of Dr. Barry, which Mr. Cassidy declined to do.
Shortly afterwards plaintiff consulted his present attorney.
There is no evidence that the plaintiff before the present
action was begun in September brought to Mr. Cassidy's
attention the charge that the release was procured by fraud.
It also appears that Dr. Barry before the accident had
usually attended the plaintiff when he needed a doctor.
Certain of these matters, considered in connection with the
obvious interest of some of the witnesses, are of importance in
weighing the probabilities and in determining what wit-
nesses are entitled to belief.  As we have said many times
the opportunity to hear and see witnesses is of such value in
determining the weight to be given to what they testify to
that we ought not lightly to set aside the findings of fact of a
jury when they are upheld by the decision of the trial
judge.  We should not do so unless it is plain that an
(2) injustice has been done.  In the present case we do not feel
warranted in saying from our examination of the transcript
of the testimony that the finding of the jury was without
adequate support or that the denial of the motion for a new
trial was an error, in so far as such denial involves an
approval of the special finding of the jury.

A second question of fact was presented to the jury by the
evidence, not as a special finding, but as necessary for
determination in rendering their general verdict.  It must
be considered before reaching a decision upon the 54th
exception.  It is whether or not the plaintiff by his conduct
after the execution and delivery of the release ratified it
and thus precluded himself from maintaining this action.
This conduct has already been referred to considering the
last point.  As bearing upon this the time when the second
instalment of $63 was paid is of significance.  The testimony

was conflicting as to when and by whom it was paid. The· defendant's claim is that it was after the time when the plaintiff alleges he discovered the fraud, and the plaintiff's· that it was before. The question has been presented and argued with vigor, but like the one already considered, its answer must be determined by whichever of the con-- flicting accounts is accepted as credible and true. In such circumstances questions of this kind are often difficult to· answer, and the answer given generally difficult to satis-- factorily review. We do not discover sufficient reason for· saying that there was error on the part of the jury in finding no ratification of the release, or on the part of the trial judge in sustaining their action. In other words, we do not find that the verdict or the special finding is against the evidence. The 54th and 57th exceptions are therefore overruled.

Accepting the finding of the jury that Mr. Cassidy did on March 17th tell Mr. Smith that Dr. Barry had said that he would be out and at work in two weeks, the question arises as to its legal effect. Did it constitute fraud ? Was it a mis- representation as to a material fact, and did the plaintiff have a right to rely upon it ? In Pomeroy's Eq. Juris., Vol. 2, §§ 877 and 878, referring to misrepresentations as constituting fraud it is said, "A misrepresentation must be an affirmative statement or affirmation of some fact, in con- tradistinction to a concealment or failure to disclose, and to a mere expression of opinion." . . . "It has some- times been said, but very incorrectly, that a misrepresenta- tion cannot be made of a matter of opinion." . . . "Wherever the statement, although relating to matter of opinion, is the affirmation *of a fact* it may be a fraudulent· representation."

The rule as to materiality is stated thus in 12 R. C. L.,. Fraud and Deceit, Section 61 (p. 299). "A fact is material when it influences a person to enter into a contract, or when it· deceives him and induces him to act, or when without it the transaction would not have occurred. It is broadly stated,

therefore, that the representations must have operated as an inducement in the making of the contract in question, that is, must have influenced the mind of the party to whom they are made in making the contract or fixing its terms." Respecting the right to rely on representations, it is stated in 14 Am. & Eng. Encyc. of Law 120, "By the overwhelming weight of authority, ordinary prudence and diligence do not require a person to test the truth of representations made to him by another as of his own knowledge, and with the intention that they shall be acted upon, if the facts are peculiarly within the other party's knowledge or means of knowledge, though they are not exclusively so, and though the party to whom the representations are made may have an opportunity of ascertaining the truth for himself." See, also, 20 Cyc. 33. In 12 R. C. L. 360, the general attitude of courts to this subject is thus stated: "The policy of the courts is, on the one hand, to suppress fraud, and, on the other, not to encourage negligence and inattention to one's own interests. The rule of law is one of policy. Is it better to encourage negligence in the foolish, or fraud in the deceitful? Either course has its obvious dangers. But judicial experience exemplifies that the former is less objectionable, and hampers less the administration of pure justice. The law is not designed to protect the vigilant, or tolerably vigilant alone, although it rather favors them, but is intended as a protection to even the foolishly credulous as against the machinations of the designedly wicked." As might be expected, however, it will be found that the courts differ as to the circumstances under which fraudulent representations may be relied on. A slight difference in the facts will often lead to different decisions in cases generally similar as to their facts. Both parties to the present action have cited cases more or less similar to the present one in support of their respective claims as to the law.

They are similar in that all of them (except one) were actions to recover damages for personal injuries alleged to have been caused by the negligence of the defendants. In

all of them the defence was interposed that in consideration of certain payments to him made the plaintiff had released all causes of action for such injuries, which defence was met by the claim that the release had been obtained by fraudulent representations of the defendant's agent, although the execution of the release was admitted. In most of the cases the representations relate to the character of the injuries and the time of recovery therefrom. These representations were made by some agent of the defendant, generally a claim agent, but sometimes by a physician. The cases cited in some instances also show the differences already referred to in the statements as to the character of the evidence necessary to prove fraud. The plaintiff cites the following cases.

*Peterson* v. *Chicago, Milwaukee & St. Paul Ry. Co.*, 36 Minn. 399 and 38 Minn. 511. The alleged false representation, as appears in the first report of the case, was that "Dr. Clark, the physician whom plaintiff had employed immediately after her injury, said to defendant's agent who procured her signature to said release, that her injuries would soon be cured with proper treatment." The plaintiff recovered a verdict at the first trial, which was set aside for a reason not necessary to be discussed. As to the representation of fraud the court on page 402 said, "We do not doubt that the jury might find a right to avoid the release because of the representation as to the opinion of Dr. Clark." At the second trial the verdict was for the plaintiff. The trial court gave the following instruction, 38 Minn. 511, at 513: "You understand, gentlemen, in regard to this matter of whether a release was obtained by fraud turns upon the question of the alleged fraudulent representation in regard to the opinion of Dr. Clark. To justify holding the release invalid on account of fraud, you understand she must have believed the misrepresentation, and it must have been the inducing cause for her action. Although she may have had some doubts in her own mind as to whether she could recover or not, if she actually believed and relied

upon the alleged representation of Dr. Clark that she would get well, and if such belief was the inducing cause of her signing the release, it would be ground for avoiding the release." To this the defendant excepted. On review it was held to state the law correctly.

In *Marple* v. *Minn. & St. L. Ry. Co.*, 115 Minn, 262, 264, the alleged misrepresentation was that defendant's claim agent told the plaintiff that his attending physician said he would be well and able to go to work in three weeks. The court said, "The evidence was sufficient to justify the jury in finding the defendant's claim agent stated to plaintiff that his physician said he would be well and able to go to work in three weeks, that the statement was false, and that plaintiff was induced to make the settlement in reliance on the supposed opinion of his physician. That such a representation fraudulently made and relied on is sufficient fraud to avoid the contract is settled."

In *Owens* v. *Norwood White Coal Co.*, 133 N. W. 716 (Iowa, 1915), the testimony was that defendant's claim agent said the plaintiff's doctor told him he would be out in six weeks. The testimony of the plaintiff was corroborated by his wife, and the doctor testified he had made no such statement. In this case the doctor was just outside the door of the plaintiff's room when the claim agent went to see him. The claim agent, as in the case at bar, denied having made any such statement. The opinion of the court contains the following: "If it be true that Woodbridge professed to have gone out and obtained the doctor's opinion to the effect that an early recovery was probable, when in truth the doctor did not so say in substance or effect, the misrepresentation was of a material character, and if the plaintiff believed and relied thereon, and was thereby induced to accept the offered settlement, when in fact his injury was of a much more serious character, it was a fraud which would avoid the settlement, and entitled him to recover the damages actually sustained."

In *Mattson* v. *Eureka Cedar Lumber & Shingle Co.,* 79 Wash. 266, the alleged fraudulent representation was that the defendant's manager said to the plaintiff that the doctor had told him there was nothing the matter with his leg, that no bones were broken, and that he would be able to walk after two weeks' time.   The court on p. 272 says: "If the jury believed this testimony," referring to the denial that the doctor had made such a statement, "and further believed the testimony of the respondent and the interpreter, which was positive to the effect that the manager represented that the doctor had told him that the leg was not broken and that the respondent would be able to work in a couple or a few weeks, then the jury was justified in finding that the settlement was induced by fraudulent representations."

In *Fleming* v. *Brooklyn Heights R. Co.,* 88 N. Y. S. 732, the alleged misrepresentations of defendant's agent were that he had been sent to her by her physician to make the settlement, and that the physician had said she would be well in a day or two.   The plaintiff sent for her doctor before signing the release, but upon the agent's assurance that he was telling the truth, was in a great hurry and had no time to wait, she did execute the release before the doctor came, relying upon the representations.   The court said, "If the jury adopted plaintiff's story as the truth, as must be assumed from the verdict, it cannot be said that the rejection of the release as a defence was without adequate support.   It is well settled that a release so procured may be impeached upon the trial by the plaintiff for fraud or misrepresentation."

In *International & Great Northern R. R. Co.* v. *Katie Shuford,* 36 Texas Civil Appeals, 251, 262, the alleged fraudulent representations of the company's agents related to the extent and character of her injuries.   It was urged by the company that there was error in not instructing the jury that if she had time and opportunity to advise herself as to the truth of the representations of these agents, and saw fit to act upon them she could not recover.   Concerning this the court says, "the fact that the plaintiff believed the

representations and statements made by these agents and then acting upon them as true, without further investigation, if the representations were made in the form of a statement of fact, such failure to further investigate their truth and to advise with others would furnish no defence to the cancellation of the contract."

In *I. D. & W. Ry. Co.* v. *Fowler*, 103 Ill. App. 565, 201, Ill. 152, plaintiff claimed that he was deceived by defendant's agent as to the character of the paper signed and in *Viallet* v. *Consolidated Ry. & Power Co.*, 30 Utah, 260, the alleged misrepresentation was made by defendant's physician who attended plaintiff. The former case seems to have been decided on the evidence. In the latter case it was held that the jury might have found that the physician did not truthfully state plaintiff's condition as he really believed it to be and if so it was fraud entitling plaintiff to recover.

The defendant cites as to the point now considered the following cases. ·

In *Hardister* v. *St. Louis I. M. & S. Ry. Co.*, 177 S. W. 918 (Ark. May, 1915), the misrepresentation relied on was the statement of a claim agent of the company named Collins to the effect that plaintiff's family physician, then attending him, had said that plaintiff was not seriously injured and would be out in a short time. Physician testified that he had no conversation with the agent as stated. The testimony showed that a proposition of settlement was made one evening by the agent, and accepted by plaintiff the next evening. The court in its opinion says, "Among the tests announced by this court to determine whether contracts should be rescinded on the ground of fraudulent representations are the following: 'First, was the relative position of the parties such, and their means of information such, that the one must necessarily be presumed to contract upon the faith reposed in the statements of the other ? And, second, did the injured party rely upon the fraudulent statements of the other, and did he have the right to rely on them ? . . . "It appears that appellant had a day to determine,

after the alleged false representations were made, as to whether or not they were true. . . . The relative position of appellant and his means of information were such that he cannot in law be presumed to have signed the release upon the faith reposed by him in the statements of Collins; and, although he testified that he did rely upon such statements, he had no right, under the circumstances, to rely upon them, and cannot escape the binding obligation of his contract of release upon the plea that he did rely upon them.''

In *Pope* v. *Bailey-Marsh Co.*, 29 N. D. 355, 377, the plaintiff claimed that the release was obtained by the fraudulent representations of defendant's agent Thompson as to the character of the paper signed, that he supposed it to be a statement of how he received his injuries, and that his mental condition at the time of signing was such that he did not realize what was going on around him. The court said, "After considering the entire testimony bearing upon such settlement and release, we have no hesitancy in deciding, as we do, that the evidence is wholly insufficient to authorize a finding, either of fraud or misrepresentation upon the part of defendant's agent Thompson, in procuring such release, or that plaintiff was mentally incapable of transacting business at the time such settlement was effected. The testimony to the contrary is overwhelming, and we are forced to the conclusion that plaintiff, who concededly had the burden of proof of showing facts relieving him of the legal effect of such formal release by clear and convincing proof, has failed in meeting such burden." *Chicago & N. W. Ry. Co.* v. *Wilcox*, 116 Fed. 913, was a suit in equity to rescind a release of a claim for personal injury on the ground of fraud and undue influence and mistake in that the physician of the company, who was attending her, and the agent of the company informed her that her injuries were temporary, and that she would be well in a year, on which statements she relied, whereas her injuries were permanent. The Circuit Court found no fraud, deceit or wrongdoing

in procuring the release, but that it was executed under
a mistake as to the time she would be probably incapacitated,
and on this account alone ordered the rescission of the release.
The Circuit Court of Appeals reversed this decree.   The
court in referring to releases in settlement of unliquidated
claims said, "Nor will such agreements be lightly disturbed
upon confused, conflicting, or uncertain evidence of fraud
or mistake.   The burden is always upon the assailant
of the contract to establish the vice which he alleges induced
it, and a bare preponderance of evidence will not sustain
the burden.   A written agreement of settlement and release
may not be rescinded for fraud or mistake, unless the
evidence of fraud or mistake is clear, unequivocal and con-
vincing."   And after discussing the testimony in which it
is declared "incredible" that the doctor stated what she
claimed he did, the court further said, "The complainant
has not established her charge here by that clear, convincing
and unequivocal testimony, which is essential to sustain a
suit for the rescission of a written agreement of compromise.'"

The fact should not be overlooked that in this case neither
court found any fraud, and that the case came up on the
finding of mistake.   Referring to this the court goes on to
say:   "There is another reason why she is not entitled to a
decree in this suit.   It is that if the doctor made the state-
ment, and if she believed it, these facts would not sustain a
cause of action for rescission.   It is a mistake as to the
existence of a past or present fact material to a contract, and
that alone, that will warrant its rescission on the ground of
mistake.   Conceding, for the moment, that the doctor and
the agent told the complainant that there was no doubt that
she would be well in a year; that she believed the statement;
that she relied upon it; and that she has never recovered,—
still these facts do not establish a mistake of fact which will
warrant the avoidance of a solemn agreement of settlement."
This point is really aside from the question under considera-
tion, as fraud is here urged, and "Fraud involves the idea
of intentional deception, and exists when there is a misrepre-

sentation made with intent to deceive, or with actual knowledge of its falsity.". 12 R. C. L. p. 322.     But a mistake is an "unintentional error." Thayer, Circuit Judge, in his opinion in the last case, while concurring in the finding of fact that the evidence did not justify rescission, says: "I conceive that if Dr. Thompson, for the purpose of inducing a settlement favorable to the defendant company, did advise the complainant that she would doubtless be well within a year, when he had no expectation that she would recover, and the complainant, in reliance upon his superior professional knowledge, was thereby induced to make the settlement, it might and ought to be vacated by a court of equity, notwithstanding the fact that the advice so given was in the nature of an opinion or prophecy."

In *Barrett* v. *Lewiston, B. & B. St. R. Co.*, 110 Me. 24, 31, plaintiff charged that the release was obtained by misrepresentation as to his injuries by the physician in attendance who was employed by defendant and also that he was mentally incompetent at the time the release was given. The case was tried twice, when it was submitted to the jury only on the question of mental competency. Verdicts were rendered in favor of the plaintiff, which were set aside by the trial court. At the third trial the court charged that the jury would not be justified in finding for the plaintiff on the ground that he was mentally incompetent, but that they might find for him on the ground of fraud, if they found certain facts to be true, and the jury so found. The case was up on exceptions and on a motion for a new trial, which was granted; the court after stating the evidence says: "Under these circumstances, we think it cannot be said properly that the defendant, or its agents, had fraudulently produced a false impression on the mind of the plaintiff or that the probability of saving the leg was a fact peculiarly or exclusively within the knowledge of the defendant or its agents, or that it was the defendant's legal duty to communicate to the plaintiff the belief of its agents as to a recovery  .  .  .  The verdict was clearly wrong."

In *Borden* v. *Sandy River, & R. L. R. Co.*, 110 Me. 327, 330, it was claimed that the release had been obtained by misrepresentation of one Ireland, agent of the company. The court found no fraud. It says, "No misrepresentations were made. The only statement which the plaintiff asserts Ireland made approaching such fraud was to the effect that he claimed to have letters from Dr. Limcott and Dr. Pratt stating that the plaintiff's disability would be of only about three weeks' duration. Mr. Ireland emphatically denies this, and all the circumstances corroborate his testimony."

In *Valley* v. *Boston & M. R. Co.*, 103 Me. 106, 109, plaintiff claimed misrepresentations of defendant's agent that plaintiff had no case, and that the paper signed was only a receipt for the money paid. As to the first point the court says it was "simply a statement of an opinion on a question of law. There was nothing in the situation to justify the plaintiff in relying on that opinion or that made it invalidating fraud in the claim agent to assert it." As to the other point the court finds it not to be true on the evidence.

In *Railway* v. *Bennett*, 63 Kansas, 781, the syllabus by the court is as follows: "More than four months after the plaintiff below had suffered an actionable injury to his person by the negligence of the defendant company he made full settlement therefor with the latter. He was at the time in full possession of his faculties and thought, from the favorable progress of his injuries in the past, that he would get well within a limited time. Desiring the opinion of a physician on the matter before the settlement was made, he called on a doctor in the employ of the defendant company and asked him what he thought about his final recovery, and was told that he did not think his injury was permanent. He knew of the relation between the doctor and defendant. It turned out that his injury was permanent and he afterwards sought to set aside the settlement and satisfaction, for fraud: *Held*, that the evidence of fraud in the case was not sufficient, as matter of law, to accomplish this. . . . The expression of an opinion, honestly entertained, as to a matter

wherein opinions may differ,. does not afford ground to set aside a settlement and satisfaction on the ground that the same was obtained by fraud; and in this case: *Held,* that the evidence shows that only an opinion was given."

In *Kane* v. *Traction Co.*, 186 Pa. St. 145, 149, the alleged fraudulent representations by the agent of the company were that she would get nothing if she went to law as the judge was a stockholder in the company and that the latter would buy up the jury, the witnesses and even plaintiff's lawyers. Verdict was directed for the defendant. The court review said: "The only item of the array that comes up to the requirement of an existing fact, as a ground of relief by reason of fraudulent representations, is that the judge was a stockholder in the company defendant. This is admittedly without any foundation, but there is no clear testimony on the part of the plaintiff that this falsely alleged fact was the inducement to execute the release. On the contrary her own testimony shows quite plainly that whatever reluctance she had to accept the sum offered was due to her desire to get more, and her subsequent dissatisfaction arose from her belief that she ought to have got more, and that her injuries were greater than she at that time thought. This is no ground for avoiding the settlement. In view of the flimsy nature of the alleged misrepresentations, so little calculated to affect the judgment of any person of common sense, the evidence as to the specific facts alleged ought to be clear and at least fairly convincing. But it is not. The whole story is vague and indefinite and far below the grade requisite to set aside a formal instrument whose execution is admitted."

*Demark* v. *Milwaukee Elec. Ry. Co.*, 142 Wis. 624, 627, was decided upon the evidence. The court said: "His claim that he was told that the company had a paper signed by his cousin showing the accident was his own fault, and that if he litigated the matter it would take a long time and he would get nothing in the end, is denied by the interpreter and the company's agent. These facts and the accompanying

circumstances of the transaction, in view of the conflicting claims of the parties as to defendant's liability, make no such clear affirmative showing as the law requires to impeach the written release and set it aside. The probative force of plaintiff's evidence for such impeachment is of slight weight, and it is fully neutralized by the facts and circumstances of the case and by the positive evidence of the other parties who witnessed the transaction. 'To accomplish impeachment of a formal written instrument on such grounds, the proof must be clear and convincing beyond reasonable controversy.' "

In *Homuth* v. *Street Ry. Co.*, 129 Mo. 629, defendant's physician called to see plaintiff after the accident and in answer to a question as to her condition, said he thought she would be well in fourteen days; her own physician, who was present at the time, expressed a similar opinion. A settlement was effected and a release executed on the basis of a recovery in the time stated by defendant's physician. She did not recover till several weeks thereafter: *Held*, the evidence did not sustain the charge of fraud in obtaining the release.

The only cases among the foregoing cited by defendant decided on questions of law are *Hardister* v. *St. Louis I. M. & S. Ry. Co.* and *Railway Co.* v: *Bennett.* Leaving out of the account from the other cases cited above all of those which decided upon the evidence that no fraud was shown, and considering only the cases in which it was decided that as matter of fact there was a fraudulent misrepresentation, the clear weight of authority is that a misrepresentation like the one charged in the present case as a matter of law relates to a material fact and is one upon which, if believed, the plaintiff had a right to rely.

*Railway* v. *Bennett, supra*, simply decides that the expression of a mistaken opinion, honestly entertained, as to a matter open to differences of opinion does not constitute fraud. *Chicago & N. W. Ry. Co.* v. *Wilcox, supra,* .in the majority opinion seems to imply that a positive statement

by a physician as to the future condition of an injured person is from the necessities of the situation only an opinion respecting a future event which will not warrant the rescission of a contract on the ground of mistake. Assuming the statement to be an opinion honestly entertained the view expressed is in harmony with *Railway* v. *Bennett*. But if for the purpose of inducing a settlement favorable tò the company employing him he should dishonestly advise a plaintiff as to his prospects of recovery that would introduce the element of fraud, which, if relied on, would avoid the settlement. See the opinion of Thayer in the same case, Pomeroy's Eq. Juris., Vol. 2, § 878, *Viallet* v. *Consolidated Ry. & Power Co.*, *supra; Butler* v. *Gleason*, 214 Mass. 248, 252, and *Galveston H. & S. A. Ry. Co.* v. *Cade*, 93 S. W. 124, 127 (Texas Civil App. 1915). And it has been shown that fraudulent misrepresentations of claim agents as to statements of attending physicians respecting the time of recovery of injured persons, if relied on, constitute fraud and render void settlements based thereon.

*Hardister* v. *St. Louis I. M. & S. Ry. Co.*, *supra*, is an authority against plaintiff's right to rely upon the claim agent's alleged misrepresentations, but we regard it as against the weight of authority and as establishing too harsh a rule respecting the duty to investigate representations of fact before making contracts in reliance upon them. *International & Great Northern R. R. Co.* v. *Shuford*, *supra;* 14 Am. & Eng. Encyc. of Law, 120; Pomeroy's Eq. Juris., Vol. 2, §§ 891, 895.; 12 R. C. L., p. 378, § 130.

(3) The 51st exception was taken to that portion of the charge wherein the jury was instructed that they were to decide whether the plaintiff acted within a reasonable time in repudiating the release and settlement.

The defendant as already stated claims a ratification of the release by the plaintiff and we have found that the verdict of the jury in its effect that this was not the fact was not error on the evidence, if that question was one for the jury. There is little controversy, if any, as to the law on this point.

The defendant has cited many cases on the rescission of contracts. While rescission and ratification are often both properly discussed in determining the effect of certain proved facts, there are of course many cases of rescission into which the question of ratification does not enter, as ratification or affirmance will defeat rescission. If only the question of reasonable time for disaffirmance is involved, the question may be one of law only. But if there is conflicting evidence as to the facts, it is primarily a question for the jury. If in the present case it had been found as a fact that after knowledge of the alleged fraud the plaintiff accepted part of the money to be paid him under the agreement to settle, it would be weighty as evidence of a ratification of the act. *Marple* v. *Minn. & St. L. Ry. Co., supra,* 334; *Lamden* v. *St. Louis Southeastern Ry. Co.,* 170 S. W. 1001 (Ark. 1914). As to the question of reasonable time we think the rule is correctly stated in *Butler* v. *Gleason, supra,* 253, where the court says, "It is only where the facts are not in dispute, and are susceptible of but a single inference, that the question of what is a reasonable time in which a party must act or be barred of his rights, can be determined as matter of law." See, also, *Brainard* v. *Van Dyke,* 71 Vt. 359, 366; *Hill* v. *Hobart,* 16 Me. 164; *Wingate* v. *King,* 23 Me. 35; *Galveston, H. & S. A. Ry. Co.* v. *Cade, supra.*

The 51st exception therefore is overruled and we are of the opinion also for reasons already indicated that the denial of the motion for a new trial on the ground that the verdict was contrary to the law was not error. The 55th exception is accordingly overruled.

The defendant's 50th exception is taken to a portion of the charge of the court relative to the answer of the jury to the question submitted for a special finding. The court had said "that question requires an answer and you must return a unanimous finding on that just the same as on the verdict; that is, you will really have two findings. You will have this paper with you and if you find no, you answer no right on it there, simply no. If you find yes, you will write that on,

simply yes, and bring it back to us here." Following this
the court went on to say, and this is what is objected to,
"Now with regard to that. As counsel for the plaintiff
has said, his case to a very large extent turns on that finding
if, as he says himself with absolute accuracy, if Mr. Cassidy
did not make that statement in substance to Mr. Smith then
the plaintiff's case falls because there is no fraud proved.
That is what they rely on to establish this fraud." The
(4) objection is based on the fact that the instruction informed
the jury of the effect of their answer to this question in
relation to their general verdict. In some states such
instruction is held to be error. There is a long line of cases
to this effect in Wisconsin. See *Banderob* v. *Wisconsin
Central R. Co.*, 133 Wis. 249, which cites and discusses over
forty Wisconsin cases as illustrating what is said to be the
impracticability of combining a special verdict with a
general verdict because of the difference in the mode of
instructing the jury. In that State the practice of sub-
mitting enough interrogatories to constitute a special
verdict obtains to a great extent. It has been said that a
special verdict consists of findings upon all material issues—
a determination of facts in such manner that nothing
remains for the court but to apply the law thereto; that the
special verdict is the sole basis of the judgment. It is
unlike a general verdict in form. It concludes conditionally
that if, upon the whole matter, the court should be of the
opinion that the plaintiff has good cause of action, the jury
find for the plaintiff and assess his damages; if otherwise,
then for the defendant. The doctrine that it is error to
inform the jury of the legal effect of their answer to a question
submitted to them for a special finding is held in some other
states. *Beecher* v. *Galvin*, 71 Mich. 391, 396; *Morrison* v.
*Lee*, 13 N. D. 591; *Walsh* v. *J. R. Thomas Sons*, 110 N. E.
454 (Ohio, 1915). We have no practice or statute of this
nature. Clementson in his work on special verdicts on
page 44 notes the distinction between special verdicts and
findings in response to special interrogatories, that they are

not the same thing, though they to some extent subserve the same purpose.   On page 90 the author (who is a member of the Wisconsin bar) says, "Where a special verdict is submitted to a jury, the court is not required to give instructions as to the general rules of law applicable to the case.   Indeed, it is not good practice to do so.  .  .  .   In such cases the instructions are properly confined to the questions submitted."   But when findings upon particular questions of fact are required together with a general verdict, even under the procedure above referred to, it is proper and generally necessary to charge the jury as to the general rules of the law by which they are to be guided.   The author last quoted says that in such case, "The main object of the charge is to assist the jury in arriving at a general verdict in conformity to the law and the evidence; the findings are merely incidental."   In Section 6 of Chap. 291 of the General Laws of Rhode Island, 1909, both expressions, "special verdicts" and "special findings" are used, but the latter seems to be the more accurate.   What is there contemplated is obviously not a special verdict in the sense above described.   At any rate there is no restriction upon the trial court in charging a jury similar to that which seems to prevail in Wisconsin and some other states.   Section 20 of Chap. 273 of the General Laws provides that "In every case, civil and criminal, tried in the Superior Court with a jury, the justice presiding shall instruct the jury in the law relating to the same, and may sum up the evidence therein to the jury whenever he may deem it advisable so to do; but any material misstatement of the testimony by him may be excepted to by the party aggrieved."   A similar provision contained partly in the Constitution and partly in statutes has existed for more than seventy years.   As stated in *Desautelle* v. *Nasonville Woolen Co.*, 28 R. I. 261, 263, "Under these provisions the duty of the judge is imperative in every case to instruct the jury in the law applicable to it, but he is not required to comment upon the testimony unless he deems that by so doing he may assist them in

coming to a right conclusion." . . . "While scrup-
ulously reserving to the jury the right and duty of deciding
upon the facts according to their own consciences, he should
not hesitate, when in his opinion the occasion demands it,
to make such comments on the evidence as be believes will
direct them to right conclusions." In the performance of
his duty in giving instructions as to the law and in the
exercise of his sound discretion in commenting upon the
evidence in the endeavor to assist the jury to a right con-
clusion it has long been an unquestioned practice for the
trial judge to instruct the jury as to the law applicable to the
case on trial by saying that if they find certain facts to be
proved they should render their verdict in a certain specified
way. The legal effect of their findings of fact is pointed out
to them. In the present case, had no question for a special
finding been submitted, it would have been natural and
proper to give the jury in effect the instructions objected to.
Because the special finding was requested on what was the
pivotal fact in the case, the duty and sound discretion of the
trial judge so far as the form and character of his instructions
are concerned were not restricted or circumscribed thereby.

The 50th exception is overruled.

The 52nd exception was taken to the refusal of the court.
to charge the fourth and fifth requests of the defendant.
We think they had already been stated with sufficient
fulness and adequacy in the charge of the court and this
exception is overruled.

The 53d exception was taken "to that part of the argu-
ment of the plaintiff's counsel which was as follows: 'That
if you answer that special finding 'no' then you throw us out
of court, we have no case, and we can't get a cent. If you
answer that question no then we have no case and you
throw us out of court.'" This obviously is not an exception
to a ruling of the court, and the taking of an exception in this
manner is not provided for in Chap. 298 of the General
Laws. The proper way would have been for the defendant
to request the court to instruct the jury to disregard the
remarks. If this had been done and the court had refused,.

an exception would have raised the question. As it now stands the matter is not properly before us for review. *State* v. *Farr*, 29 R. I. 72, 75.

The 56th exception is based on the claim that the award of damages was excessive. The trial judge in his rescript with almost no discussion of the question said, "the liability of the defendant in this case is clear," but obviously from the fact that he discussed it so fully he regarded the question of damages a more difficult one. It is clear that the plaintiff suffered injury as a result of the accident and is entitled to damages. There is, however, a real difficulty in satisfactorily determining to what extent the accident caused the disability of the plaintiff existing after its occurrence. He was sixty-two years of age at the time of the accident, and up to that time had worked regularly and been self-supporting, earning $13.25 a week. He had, however, previously suffered from enlargement of the joints of his fingers and toes and of his elbows and had some difficulty in locomotion due either to calloused feet or stiffness of joints, or both. The weight of the medical testimony seems to indicate that prior to the accident he was the victim of a not at present very well understood disease, designated by different names in the testimony as some kind of arthritis, of which the enlargement of the joints is characteristic. This is said to be progressive, incurable and eventually productive of complete disability.

It appears from the evidence that since the accident the plaintiff has been practically incapacitated for work and that his right knee is the seat of much of his physical trouble. There is a conflict in the medical testimony as to what its present condition is chiefly due—the accident or the disease. While it seems reasonable to conclude that it is due in part to each cause, it is difficult, if not impracticable, to satisfactorily determine for what part of the condition each is responsible. In these circumstances and in reference to a matter which is so largely left to the sound discretion of a jury to determine, we do not feel justified in saying that the

award of damages by the jury was excessive or that its approval by the trial judge was error.    The exception thereto is overruled.

All of the exceptions are overruled, and the case is remitted to the Superior Court for judgment on the verdict.

VINCENT, J., dissenting.    Without undertaking to write an extended opinion I am constrained to say that a careful consideration of this case leads me to a different conclusion from that of the majority of the court as to the validity of the release in question.    A release executed with all the formalities belonging to an instrument of that character· should never be set aside on the ground that it was procured by fraud or misrepresentation unless the evidence of such fraud or misrepresentation is clear and unmistakable.    A mere conflict of testimony, as in the present case, is not sufficient.    To hold that a release may be set aside, except upon the strongest and most convincing testimony, is to destroy the value of releases and render them practically worthless and inoperative as a protection to those who may, in good faith, obtain them.

*Everett L. Walling,* for plaintiff.

*Clifford Whipple, Alonzo R. Williams, Albert W. Peterson,* for defendant.